IN THE UNITED STATS DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE FEDERAL SAVINGS BANK, ) | |
| ) | |
| Plaintiff, ) | Case No. 1:24-cv-5152 |
| ) | |
| v. ) | |
| ) | |
| AHMAD JOHN AFZAL, ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**THE FEDERAL SAVINGS BANK**
Max A. Stein (ARDC No. 6275993)
Keith M. Stolte (ARDC No. 6244848)
Monica L. Thompson (ARDC No. 6181455)
TottisLaw
401 N. Michigan Ave., Suite 530
Chicago, IL 60611
mstein@tottislaw.com
kstolte@tottislaw.com
mthompson@tottislaw.com

By flagrantly disregarding and violating the terms of an Employment Agreement he signed as part of his employment with The Federal Savings Bank ("TFSB"), Defendant Ahmad John Afzal ("Afzal") forced TFSB to bring this litigation. And because Afzal is currently using TFSB's trade secrets to solicit TFSB customers and unfairly compete with TFSB, TFSB must also bring this motion requesting that the Court prevent Afzal from causing further irreparable harm to TFSB.

Afzal worked at TFSB as a mortgage banker and then Vice President. As part of his employment with TFSB, Afzal signed an employment agreement that included not only generous compensation, but also protected TFSB's trade secrets and other proprietary and confidential information. Using that information, Afzal succeeded at TFSB, generating over $45 million in mortgages and loans and earning over $500,000 in 2023 alone. In January 2024, Afzal voluntarily left TFSB and went to work for a competitor (as he was most certainly entitled to do). Had Afzal simply taken his talents and gone to work at that competitor, things would have ended there.

But Afzal did not simply take his talents to his new job. He also took misappropriated TFSB trade secrets and other proprietary and confidential information and used (and is using) them to poach TFSB's customers and prospective customers, all in flagrant violation of his employment agreement. TFSB has recently discovered that, before leaving TFSB, Afzal, without authorization, exported and emailed data from TFSB's mortgage and loan databases to his personal email address. The spreadsheets Afzal sent himself contain highly valuable customer-related trade secret and otherwise confidential and proprietary information for nearly 15,000 TFSB customers that TFSB collected and protected over years and is crucial to TFSB's business and customer goodwill.

Since voluntarily leaving TFSB, Afzal and others have used (and are using) TFSB's information to contact TFSB's customers and prospective customers trying to poach those customers to Afzal's new employer and TFSB's competitor. In some instances, it appears that Afzal has led TFSB's customers to believe he is still with TFSB, creating additional potential harm for TFSB.

To address Afzal's unlawful actions, TFSB seeks preliminary relief to stop Afzal from misusing TFSB trade secrets and other confidential and proprietary information, unlawful solicitation of TFSB customers in violation of his employment agreement, and other wrongful conduct.

## FACTUAL BACKGROUND

### A. TFSB's Business And Customer Relationships.

TFSB is a bank headquartered in Chicago specializing in mortgage lending, including adjustable-rate and fixed-rate mortgages, FHA loans, and Veteran Affairs home loans. TFSB was founded and operated by veterans and focuses on U.S. veterans with about 30 percent of its lending services directed to veterans. See Declaration of John T. Calk, ¶¶ 1-2 ("Calk Decl.").

TFSB's continued business success depends on its customer relationships and so TFSB expends considerable time, effort, and money initiating, developing, and maintaining its customer relationships. This allows TFSB to preserve its competitive advantage. TFSB does not publicly disclose its customers' names or contact information, loan information, credit and risk analysis, or other highly confidential and proprietary information. TFSB also treats the terms and conditions of TFSB's mortgages and other loans to its customers as confidential. In addition, information regarding customers' mortgage and other loan terms is available internally at TFSB on a need-to-know basis. TFSB maintains this confidentiality through non-disclosure agreements with personnel who have access to confidential information. TFSB's efforts to protect the valuable information it develops about its customers and potential customers has enabled TFSB to develop and maintain a strong reputation in the marketplace and engendered substantial goodwill with its customers. These continuing efforts and this goodwill are critical to TFSB's success, and they result in TFSB gaining repeat business from its established customer relationships. Calk Decl. ¶¶ 3-5.

### B. TFSB's Confidential And Trade Secret Information.

To conduct its mortgage and loan business and meet customers' needs, TFSB has developed and relies upon certain trade secrets and other confidential and proprietary information ("Confidential Information and Trade Secrets"), including, but not limited to: mortgage and loan database compilations containing confidential and customer sensitive information, including names of customers, contact information, credit ratings, credit analyses, loan amounts, interest rates, loan to value ratios, and debt to value ratios; customer mortgage and loan histories; customer communication logs; customer credit analysis; loan risk analysis; a Leads Management System, Controlled Business Arrangement Agreements and Marketing Services Agreements with other banks, realtors, developers, title companies and other partnering entities; TFSB's marketing strategies, operational methods and strategic business planning; financial information and projections; and personnel data. Calk Decl. ¶ 6.

TFSB goes to great lengths to ensure that its Confidential Information and Trade Secrets are sufficiently protected, including: (a) limiting access to confidential information on a need to know basis; (b) utilizing computer and database passwords; (c) transferring certain information only through secure file transfer protocol with encrypted passwords; (d) limiting access to offices; (e) monitoring who is given access to confidential information; (f) instructing personnel not to show confidential information to customers or persons outside TFSB; (g) entering into non-disclosure agreements with other banks, realtors, title companies and other business partners; (h) requiring all confidential and proprietary information to be used for business purposes only; and (i) maintaining customer mortgage and loan physical files in secured locations with limited authorized access. Calk Decl. ¶ 7.

### C. Afzal's Employment At TFSB.

Having previously worked for TFSB, Afzal decided to return to TFSB and accepted a position as an Inside Commissioned Mortgage Banker on May 20, 2022 and started back at the bank on May 31, 2022. A little less than a year after his return to the bank, on April 17, 2023, Afzal was promoted

3

to Vice President and continued in that role until January 2024, when he again voluntarily ended his employment. As part of his agreement to return to the bank, TFSB and Afzal entered into an employment agreement on May 20, 2022, entitled Terms of Employment (the "Employment Agreement"). Complaint, Ex. A. Afzal's Employment Agreement is substantively similar to agreements that the bank enters into with employees who will have access to its Confidential Information and Trade Secrets. Calk Decl. ¶¶ 8-11.

As both an inside commissioned mortgage banker and Vice President, Afzal was responsible for originating and facilitating the processing and closing of loan products and financing of residential real estate transactions for TFSB's customers. Calk Decl. ¶ 12. As Afzal acknowledged in his Employment Agreement, during the course of his employment with TFSB he would have access to and become familiar with the TFSB's operations, Confidential Information and Trade Secrets (as defined above), along with other proprietary information developed by and belonging to TFSB. Employment Agreement, §3(a). Afzal also acknowledged that such information, as well as TFSB's personal relationships and goodwill, would enable Afzal to compete unfairly against the TFSB during or upon termination of his employment with the bank. *Id.*

Afzal's Employment Agreement (and Handbook rules incorporated by Section 2 of the Agreement) contain several binding provisions protecting TFSB's Confidential Information and Trade Secrets, customer relationships and associated good will. For example, the Employment Agreement contains prohibits Afzal from soliciting TFSB customers or prospective customers:

> From the date on which you execute this Term of Employment through the period ending 12 months after your employment with the Company terminates, regardless of the reason for such termination, you will not solicit, entice, cause, encourage, induce, facilitate, attempt to induce, aid or assist any other party or person in soliciting, inducing, facilitating, or attempting to induce: (1) any customer or prospective customer of the Company with whom you discussed potential loan options or scenarios in the twelve (12) months preceding termination of employment with the Company; (2) any person who provided confidential or proprietary information to the company within the preceding 12 months; or (3) any person who in the preceding 180 days closed a loan with the Company, to engage the services of another person or

4

>entity engaged in residential mortgage lending for the purpose of securing financing or refinancing of any residential mortgage loan.

Employment Agreement, §3(c). In Section 3(f) of the Employment Agreement, Afzal acknowledged that any breach of the non-solicitation provision would inevitably lead to irreparable harm justifying immediate and final injunctive relief. *Id.*, §3(f). Upon termination of his employment, Afzal was obligated to "deliver immediately to the Company all property belonging to the Company or any of its customers or employees, and all other property relating to their business(es) which may be in your possession or under your control" and agreed that he or anyone acting on his behalf would "not keep copies of any reproducible items or extracts from them and will not download any information stored on any computer storage medium." *Id.*, §5(c). TFSB's Handbook prohibits employees from "[a]ccessing, transmitting, downloading, uploading or otherwise misappropriating trade secrets, proprietary information, or confidential information belonging to the Bank." Calk Decl. ¶ 11.

While employed by TFSB, Afzal interacted with scores of TFSB customers, providing mortgage lending services. Afzal was well compensated for his work at TFSB, earning in excess of $500,000 during 2023. While employed by TFSB Afzal had access to TFSB's Confidential and Trade Secret Information and, because he had management-level access to TFSB's systems, he also had access that would allow him to (i) view every funded loan for every TFSB customer in his division; (ii) sort loans by closing dates, interest rates, and other key information to identify those loans that might benefit from being refinanced; and (iii) access and download information on future marketing approaches and TFSB's Leads Management System, all solely for bank business. Calk Decl. ¶ 12-14.

On January 2, 2024, Afzal voluntarily resigned from TFSB. Calk Decl. ¶ 15.

### D. Afzal's Misappropriation Of TFSB's Trade Secrets And Initial Breach Of His Employment Agreement.

Almost immediately after he left TFSB in January 2024, Afzal began misusing TFSB's Trade Secret and Confidential Information in attempts to poach TFSB's customers. TFSB first learned of

5

Afzal's actions in late January 2024, after Afzal repeatedly contacted a TFSB customer located in Colorado. Afzal contacted this customer to pitch a new loan to replace the loan that the customer had from TFSB. The Customer became annoyed by the multiple phone calls from Afzal and contacted TFSB, first alerting it to Afzal possibly using its confidential and proprietary information in violation of the covenants of his Employment Agreement. Calk Decl. ¶ 16.

Upon learning this, TFSB's attorney sent Afzal a letter via email reminding him of the covenants in his Employment Agreement and demanding that he "immediately cease and desist all contacts with the bank's prospective borrowers in violation of your employment contract with the bank." Complaint, Ex. D. Though neither Afzal nor his new employer, Barrett Financial Group LLC of Gilbert, Arizona ("Barrett Financial"), which was copied on the letter, responded to the letter, TFSB believed that the letter had the intended effect and that Afzal was complying with his obligations under the Employment Agreement since it did not hear from any customers or see any other signs of Afzal breaching his obligations. Calk Decl. ¶¶ 17-19.

      **E.**    **TFSB Learns That Afzal Is Still Misusing Its Trade Secrets And Confidential Information And Breaching His Employment Agreement.**

Around May 17, 2024, in response to a marketing pitch from a TFSB banker, a customer Afzal had worked with while at TFSB informed the bank that "I recently refinanced with John [Afzal]. . . . John reached out to me after the 6 months and I completed the refi with him." On May 22, 2024, another customer informed TFSB that she had been contacted by William Cunnington, another banker at Barrett Financial. Although this customer had not previously worked with Afzal, another TFSB banker worked with the customer on five different loans. Calk Decl. ¶¶ 20-21.

The next day, May 23, 2024, Afzal called a third TFSB customer to pitch a refinance of a Veterans Affairs mortgage. This customer also had not previously worked with Afzal but instead worked with another TFSB banker starting in October 2023. Afzal proposed a new VA mortgage

6

from his new employer to replace the mortgage that this third customer had with TFSB. Afzal followed up with a text to the customer stating the following:

> Hello [Customer], It was an honor speaking with you today sir. We are planning on finalizing your VA mortgage on the last week of June, therefore you will be skipping your July and August mortgage payments sir. No matter what keep making your payments until we get final word from the VA sir. Also please provide me with the following documents below. We will be in contact & have a blessed day!
>
> -Mortgage statement
>
> -Home owners insurance declaration page
>
> -Drivers license
>
> ***Please email them to me at Johnkim@saxtonmortgage.com***

Calk Decl. ¶ 22. Notably, Afzal's text included contact information for him indicating that he was working with Saxton Mortgage as a Senior Loan Officer. Despite that contact information including an email address for Afzal with Saxton Mortgage, the substance of Afzal's text message to this third customer included an email address at saxtonmortgage.com for John Kim, not Afzal himself.[1]

Based on these contacts, TFSB conducted an investigation that revealed that, prior to leaving TFSB, Afzal violated the terms of his Employment Agreement. On multiple occasions, Afzal used his management-level access to download detailed and confidential information on TFSB customers and loan transactions and email it to his private email account (ocmortgageboss@gmail.com), which he then failed to return to the bank following his resignation. Afzal first did this on January 19, 2023 and then again on October 20, 2023. On both occasions, Afzal emailed an Excel spreadsheet containing TFSB's Confidential and Trade Secret Information about thousands of TFSB's customers and loan transactions. Complaint, Exs. B and C. The spreadsheets Afzal emailed himself included confidential information about TFSB's customers and their loans as well as information about TFSB's relationships

---

[1] On information and belief, the John Kim referenced is another mortgage banker who worked at TFSB until he voluntarily ended his employment in November 2023 and who now works at Saxton Mortgage. While they both worked at TFSB, Afzal and Kim worked together, with Kim reporting to Afzal. Calk Decl. ¶ 23.

7

and transactions with the customers, including insights gained from those transactions. Having this information would enable Afzal to better market to TFSB's customers and potential customers in the future. Calk Decl. ¶¶ 24-28.

TFSB believes that Afzal is currently using its Confidential and Trade Secret Information to assist him in poaching TFSB customers by convincing them to refinance their TFSB loans either with Afzal's new employer or with other mortgage bankers working with Afzal. After a reasonable investigation and as alleged on information and belief, TFSB estimates that Afzal has poached loans in excess of $5 million. Calk Decl. ¶¶ 28-30. Having made reasonable attempts to persuade Afzal to end his unlawful use of TFSB's Confidential and Trade Secret Information only to see Afzal again ignore and flagrantly violate his statutory and contractual obligations, TFSB now seeks immediate injunctive relief to protect its business interests, trade secrets and customer goodwill.

## ARGUMENT

TFSB seeks preliminary relief to preserve the status quo until such time when a full trial on the merits can be held. In the Seventh Circuit, courts engage in a two-step analysis to decide whether preliminary relief is warranted. *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). In the first step, TFSB must make a threshold showing that: (1) absent preliminary relief, it will suffer irreparable harm prior to a final resolution; (2) there is no adequate remedy at law; and (3) it has a reasonable likelihood of success on the merits. *Id.*; *see also Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). A party moving for a preliminary injunction "must only show that [its] chances to succeed on [its] claims are better than negligible." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) (internal quotations and citations omitted)

If TFSB meets this burden, then the Court proceeds to the second phase and considers the harm, if any, that Afzal will suffer if preliminary relief is granted, balancing such harm against the irreparable harm TFSB will suffer if relief is denied. *Turnell*, 976 F.3d at 662; *Storck USA, L.P. v. Farley*

8

*Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). The Court must also consider the public interest served by granting or denying the relief, including the effects of the relief on nonparties. *Storck*, 14 F.3d at 314. The Court then weighs all of these factors, "sitting as would a chancellor in equity," *Abbott*, 971 F.2d at 12, and applies a "sliding scale" approach, under which "the more likely [TFSB] will succeed on the merits, the less the balance of irreparable harms need favor [TFSB's] position." *Ty, Inc. v. The Jones Grp.*, 237 F.3d 891, 895 (7th Cir. 2001); *Turnell*, 796 F.3d at 662.

### A. TFSB Will Be Irreparably Harmed If Injunctive Relief Is Not Granted And Has No Adequate Remedy At Law.

Courts in this district have repeatedly held that the loss of customer goodwill and customer relationships, like that which TFSB is facing due to Afzal's actions, constitutes irreparable harm for purposes of preliminary injunctive relief. *See, e.g.*, *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006) (loss of goodwill, competitive position, and customer relationships constitute irreparable harm with no adequate remedy at law); *see also Nextraq, LLC v. Omnitracs, LLC*, 2022 U.S. Dist. LEXIS 230435, at *12-13 (N.D. Ill. Dec. 21, 2022) (finding irreparable harm and no adequate legal remedy where the movant faced "goodwill impairment," including "the loss of existing customers, a diminished reputation in the industry, and consequent loss of potential new customers."); *IDS Fin. Servs. v. Smithson*, 843 F. Supp. 415, 418–19 (N.D. Ill. 1994) ("Where trade secrets and goodwill are involved," the threat of irreparable harm "is significant.").

Here, TFSB lacks an adequate remedy at law to address this harm because Afzal is using TFSB's Confidential and Trade Secret Information to gain the attention of, and then steal, TFSB's customers. Through this wrongful conduct, Afzal is poisoning TFSB's market position and customer goodwill. Once Afzal's trade secret misappropriation and unfair practices succeed in poaching TFSB's customers, TFSB has no effective method for remedying its lost business with those customers. *LoanDepot.com, LLC v. Schneider*, 647 F.Supp.3d 620, 632 (N.D. Ill. 2022) (noting the difficulty a mortgage company has calculating the harm caused by a former employee poaching its customers ).

9

Likewise there is no way to truly calculate the harm suffered by TFSB as a result of the loss of its existing and prospective customers and associated goodwill. *Id.* There is no effective way to reasonably forecast what mortgage and loan business TFSB has lost, or will lose, due to Afzal and his Barrett Financial colleagues wrongful contact with TFSB's customers.[2] Indeed, because Afzal misappropriated such large amounts of TFSB's Trade Secret and Confidential Information (nearly 15,000 customers worth), there is no way that TFSB can even guess who Afzal has or will target. This means that TFSB both cannot effectively counter Afzal's efforts and cannot effectively calculate its monetary losses when Afzal's efforts succeed. Taken together, these harms as a result of Afzal's wrongful acts and unlawful competition satisfy the first two elements.

### B. TFSB Is Likely To Prevail On The Merits.

TFSB must next show that it is likely to succeed on the merits of its claims. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). While a "mere possibility of success" is not sufficient, TFSB need not prove its claims by a preponderance of the evidence. *Id.* Rather, TFSB must simply provide "facts and legal theories supporting "the key elements of its case." *Id.* at 763. Here, TFSB's meets this requirement for each of its claims.

#### 1. TFSB is likely to succeed on its trade secret claims.

TFSB has a strong likelihood of success on its misappropriation of trade secrets claims under both the Defend Trade Secrets Act 18 U.S.C. § 1836 ("DTSA") and the Illinois Trade Secrets Act 765 ILCS 1065/1 ("ITSA"). DTSA allows for a private cause of action by the owner of a trade secret that is misappropriated "if the trade secret is related product or service used in, or intended for us in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). DTSA defines "misappropriation" as either the "acquisition of a trade secret of another . . . by improper means" or the "disclosure or use of a

---

[2] Further exacerbating things here, it appears that in some instances, Afzal may have fooled customers into thinking that they are still working TFSB, rather than Afzal's new employer.

trade secret of another without express or implied consent." 18 U.S.C. § 1839(5)(A)-(B). To succeed on a claim for misappropriation of trade secrets under ITSA, meanwhile, TFSB must show that: (1) a trade secret existed; (2) the trade secret was misappropriated; and (3) it was damaged by the misappropriation and both statutes provide for injunctive relief. *See Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813 (N.D. Ill. 2014); *see also* 18 U.S.C. § 1836(b)(3); 765 ILCS § 1065/3(a).

On the first element—existence of a trade secret—both DTSA and ITSA require the same showing to establish the existence of a trade secret: (1) the secret must be sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use, and (2) the secret must be the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. 18 U.S.C. § 1839(3); 765 ILCS § 1065/2(d). Customer identities and detailed customer information constitute protectible trade secrets. *LoanDepot*, 647 F.Supp.3d at 628-29 (granting preliminary relief to protect customer lists, lists of customer loan details and customer-contact information, and sensitive personal data as trade secrets); *First Fin. Bank, N.A. v. Bauknecht*, 71 F.Supp.3d 819, 839, 841-42 (C.D. Ill. 2014) (holding that bank's customer lists and loan transaction information constituted trade secrets).[3]

Here, Afzal came into possession of TFSB's Confidential and Trade Secret Information, including TFSB's detailed customer and loan transaction information, through his employment at TFSB. Calk Decl. ¶¶ 12-14. By downloading and emailing himself the information (and failing to return it), Afzal himself created compelling evidence both that the information indeed contained trade secrets and that he misappropriated it. Indeed, Afzal's actions show the value of this information, as why else would he secretly seek to obtain it and send it to his private email account? *LoanDepot*, 647

---

[3] Courts applying other versions of the Uniform Trade Secrets Act have also found mortgage lead, loan processes, and customer lists to be trade secrets. *See, e.g., Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*, 381 F.3d 811, 819 (8th Cir. 2004); *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F.Supp.3d 1163, 1174 (D. Colo. 2018).

F.Supp.3d at 629 ("the extensive downloading and spiriting away of the information by the Individual Defendants . . . circumstantially show that basic customer-contact information indeed does have economic value.") TSFB also has compelling evidence confirming that value, as it is apparent that Afzal used it to contact at least three of TFSB's customers for the purpose of poaching those customers from TFSB. Calk Decl. ¶¶ 20-23.

Further demonstrating TFSB's efforts to maintain the secrecy of its trade secrets, upon first learning of Afzal's unlawful efforts to poach its customers in January 2024, TFSB promptly demanded that Afzal's cease his wrongful conduct and, because it did not learn of any other instances for several months, believed that Afzal had complied with his obligations. Calk Decl., ¶¶ 16-19. It was not until late May that TFSB learned of Afzal again using its Confidential and Trade Secret Information to poach its customers—only now Afzal was doing so after being put on notice that his conduct violated various contractual and statutory duties, making them all the more egregious. In sum, absent his misappropriation and unlawful misuse of TFSB's Confidential and Trade Secret Information, Afzal would have no way of knowing how to contact most of TFSB's customers and certainly would not know the terms of TFSB's relationship and loan transactions with each of them, both of which show that the information Afzal obtained was a valuable trade secret and that he misappropriated it.

The evidence also shows that Afzal's efforts were successful, as TFSB is aware of at customers who refinanced their loans with Afzal. Though TFSB cannot yet know for sure how many customers Afzal successfully poached, it has identified a number of TFSB loans that customers have refinanced with Barrett Financial following Afzal's resignation from the bank. Calk Decl. ¶ 28.

### 2. TFSB Is Likely to Succeed on Its Breach of Contract Claim

TFSB can undisputedly establish all of the elements with respect to Afzal's breach of his Employment Agreement. Those elements are: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the TFSB; (3) a breach by Afzal; and (4) resultant damages." *TAS*

12

*Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 631 (7th Cir. 2007). Here, Section 3(c) of the Employment Agreement prohibits Afzal from engaging in any of three narrowly tailored solicitations:

(a) soliciting any customer or prospective customer with whom he discussed within 12 months of his resignation potential loan options or scenarios;

(b) soliciting any person, including customers, who provided confidential or proprietary information to TFSB; or

(c) soliciting any customer who closed a loan within 180 days with TFSB to engage the services of a competitor engaged in residential mortgage lending for the purpose of securing financing or refinancing of any residential mortgage loan.

Employment Agreement, § 3(c). These restrictions are narrowly tailored so as to encompass only the protectable interests of TFSB, including its trade secrets and customer goodwill. *Outsource Int'l, Inc. v. Barton*, 192 F.3d 662, 669 (7th Cir. 1999); *Lawrence and Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill.App.3d 131, 138, 685 N.E.2d 434, 441 (Ill. App. Ct. 1997).

TFSB has substantially performed its obligations of the Employment Agreement. Calk Decl. ¶ 10. Afzal, on the other hand, violated the agreement by soliciting at least three TFSB customers, one of whom he previously worked with on loan transaction, and others who provided confidential information to TFSB to secure loans or mortgages. And TFSB has been damaged by the loss ongoing customer relationships with mortgage and loan borrower's wrongfully solicited by Afzal and lost revenue and profits as a result, as well income from refinanced loans. Calk Decl. ¶¶ 28-30.

### 3. TFSB Is Likely to Succeed on Its Interference with Prospective Economic Advantage Claim

For its claim of intentional interference with prospective economic advantage, TFSB must establish: (1) its expectation of entering into a valid business relationship; (2) Afzal's knowledge of TFSB's expectancy; (3) Afzal's purposeful interference with and defeat of the expectancy; and (4) damages to TFSB resulting from the interference. *Empire Industries v. Winslyn Industries, LLC*, 2021 U.S. Dist. LEXIS 11212, at *7 (N.D. Ill. Jan. 21, 2021). Again, each element is established here.

13

First, Afzal knows of TFSB's relationships with the customers he is seeking to poach from the detailed, non-public information he misappropriated. Next, Afzal knew of TFSB's expected ongoing relationships with these customers, especially because of his knowledge that TFSB's customers often enter into successive mortgage and refinancing agreements with TFSB. Calk Decl. ¶ 29. TFSB's evidence of Afzal contacting its customers to convince them to refinance their loans with him satisfies the third element of its claim while Afzal's success in at least a few instances satisfies the fourth. Calk Decl. ¶ 20-28. This evidence demonstrates that TFSB is likely to succeed in proving that Afzal is intentionally and unjustifiably interfering with TFSB's prospective business opportunities. *Empire Industries*, 2021 U.S. Dist. LEXIS 11212, at *9-10.

### C. Balancing The Hardships Favors Entry Of Preliminary Relief.

Having demonstrated that it is more than likely to succeed on the merits, the sliding scale used to assess the balance of hardships tilts in TFSB's favor. *See Ty, Inc.*, 237 F.3d at 895 ("the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position."). Here, the overwhelming evidence of Afzal's misconduct slides the scale towards TFSB. Afzal, meanwhile, has no legitimate right to unlawfully misappropriate TFSB's information, particularly through the wrongful use of TFSB's trade secrets, to poach TFSB's customers. *See, e.g.*, *Mazak Optonics Corp. v. Marlette*, 2017 WL 3394727, at *3 (N.D. Ill. Aug. 8, 2017) ("the public interest is supported by upholding the sanctity of confidential information such as trade secrets and preventing others from the unauthorized use" of such information). Further, Afzal cannot identify any harm to any legitimate interest of his that might result from entry of a narrowly tailored order preventing him from misusing TFSB's Confidential and Trade Secrets Information.

Conversely, TFSB will suffer significant, irreparable harm if the Court does not enter such an order. TFSB will continue to lose mortgage and loan customers to a competitor that has demonstrated no compunction about clandestinely misusing trade secrets to target and poach TFSB's customers.

Although TFSB has learned of four instances, TFSB cannot know how many other customers Afzal and his colleagues have unfairly and deceptively attempted to convert. "It is precisely the difficulty of pining down what business has been or will be lost that makes an injury irreparable." *Cumulus Radio Corp. v. Olson,* 80 F. Supp. 3d 900, 912 (C.D. Ill. 2015). Once its customer relationships and associated goodwill have been destroyed, TFSB likely cannot get them back or fairly compete in the marketplace.

Finally, there will be no injury suffered by the public if the Court requires Afzal to stop misusing TFSB's trade secrets and unfairly and deceptively competing with TFSB. To the contrary, the public will benefit from Afzal being enjoined from contacting them under unfair, and deceptive pretenses. *See, e.g.*, *Mazak Optonics,* 2017 WL 3394727, at *3. .

### D. TFSB Should Not Be Required to Post a Bond

It is within the Court's discretion whether to require TFSB to post a bond pursuant to Rule 65(c). *See Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972) (holding that district court did not abuse its discretion in refusing to require movant to post a bond where movant demonstrated a "strong likelihood of success on the merits."); *Special Educ. Servs. v. RREEF Performance, P'ship-I*, 1996 WL 41251 *2 (N.D. Ill. Jan. 29, 1996) (holding that "the posting of security is not mandatory upon issuance of a preliminary injunction."). TFSB has shown a strong likelihood of success on the merits in this case, and an injunction requiring Afzal to stop using its trade secrets and poaching TFSB customers in violation of his own contractual obligations will do no harm to Afzal. Accordingly, TFSB should not be required to post a bond.

### CONCLUSION

For all of these reasons, TFSB respectfully requests that this Court award the temporary and preliminary injunctive relief identified in the accompanying Motion.

Dated: June 20, 2024                              Respectfully submitted,

**THE FEDERAL SAVINGS BANK**

15

               By:  /s/ *Max A. Stein*
                    One of its attorneys

               Max A. Stein (ARDC No. 6275993)
               Keith M. Stolte (ARDC No. 6244848)
               Monica L. Thompson (ARDC No. 6181455)
               TottisLaw
               401 N. Michigan Ave., Suite 530
               Chicago, IL 60611
               mstein@tottislaw.com
               kstolte@tottislaw.com
               mthompson@tottislaw.com